UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# Case No. 09-21437-CIV-UNGARO/WHITE

# The attached hand-written document
# has been scanned and is
# also available in the
# SUPPLEMENTAL
# PAPER FILE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: _____

DUANE ISAAC WALKER,

            Plaintiff,

V.

MIAMI-DADE COUNTY, MIAMI CHILDR-
EN'S HOSPITAL, UNIVERSITY OF MIAMI'S
SCHOOL OF MEDICINE'S ORGAN PROCUREM-
ENT ORGANIZATION, **and** BRUCE A. HY-
MA, SUSAN S. IGNACIO, EMMA LEW,
R. CORDERO, CHRIS STROZE, CATHERINE
VOGEL, and DAWN DENARO, sued in
their individual capacities, and LEOP-
OLDO MALVEZZI, PORNPIMOL RIANTHA-
VORN, BALAGANGADHAR TOTAPALLY,
JEFFREY B. SUSSMANE, SYED ARSHAD
ALI, DR. DINERMAN, FARZANA PERW-
AD, DR. GELVEZ, AMED ROQUE, JEN-
NIFER L. DELPHUS, MICHAEL D. HIGU-
ERA, and ROBERT C. TAUKUS,

            Defendants.

**09-21437**

CIV-UNGARO

COMPLAINT

MAGISTRATE JUDGE
WHITE

JURY TRIAL
DEMANDED



FILED by _____ D.C.

MAY 28 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. – MIAMI

cat/div 1983/Dade
Case # 09CV21437
Judge UU   Mag PAW
Motn Ifp Yes   Fee pd $ O
Receipt # _____

## Preliminary Statement

This is a civil rights action filed by Duane Isaac Walker, pro se, a pretrial detainee, for declaratory judgment and damages under 42 U.S.C. Section 1983, alleging constitutional torts arising from the failure to preserve critical and exculpatory evidence, deliberate indifference to the plaintiff's right to the due process of law, prosecutorial misconduct, and civil conspiracy to deprive the plaintiff of his right to the due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The plaintiff also alleges the torts of conspiracy to commit tampering, tampering, conspiracy to obstruct justice, solicitation to obstruct justice, obstruction of justice and negligence. The plaintiff is _not_ challenging his detention or state prosecution at this time.

## Jurisdiction

1.  The court has jurisdiction over the plaintiff's claims of violation of federal constitutional rights under 28 U.S.C. Sections 1331 and 1343(a)(1),(2) and (3).

2.  The court has supplemental jurisdiction over the plaintiff's state law tort claims under 28 U.S.C. Section 1367.

## Parties

3.   The plaintiff, Duane Isaac Walker, pro se, is a pretrial detainee incarcerated at Metro West Detention Center, 13850 N.W. 41st Street, SMU-South-150, Miami, FL. 33178. The plaintiff is charged with murder and is awaiting trial in a criminal case surrounding the events described in this complaint.

4.   Defendant, Miami-Dade County, is the local government within the state of Florida where the events described in this complaint took place. Defendant, Miami-Dade County, employed defendants, Hyma, Ignacio, Lew, Cordero and Stroze during these events.

       address:   County Attorney's Office
                 111 Northwest First Street, suite 2810
                 Miami, FL. 33128

5.   Defendant, Miami Children's Hospital, is the business entity where the alleged victim in the plaintiff's criminal case was taken and treated for his injuries during the events described in this complaint.

       address:   3100 S.W. 62nd Avenue
                 Miami, FL. 33155

6.   Defendant, University of Miami's School of Medicine's Organ Procurement Organization, is a business entity that was active in the endeavor to harvest the organs of the alleged vi-

ctim in the plaintiff's criminal case during the events described in this complaint.

> address: 1150 N.W. 14th Street, suite 208
> Miami, FL. 33136

7.   Defendants, Bruce A. Hyma, Susan S. Ignacio, and Emma Lew, were Assistant Medical Examiners or Fellows employed at Miami-Dade County Medical Examiner's office during the events described in this complaint that pertain to their actions. They are sued in their individual capacities.

> a. Bruce A. Hyma
> Miami-Dade Medical Examiner
> 1 on Bob Hope Rd.
> Miami, Florida 33136

> b. Dr. Susan S. Ignacio
> District 6 Medical Examiner's office
> 10900 Ulmerton Rd.
> Largo, FL. 33778

> c. Dr. Emma Oy Hir Lew
> Miami-Dade County Medical Examiner
> Number One on Bob Hope Road
> Miami, FL. 33136

8.   Defendants, R. Cordero and Chris Stroze, were the investigating homicide detectives assigned to the plaintiff's criminal case and were employed at Miami-Dade Police Department during the events described in this complaint that pertain to their actions. They are sued in their individual capacities.

   a.  R. Cordero, ID Number: 4320 (MDPD)
       Richard Gerstein Justice, Building
       1351 N.W. 12th Street
       Miami, FL. 33125

   b.  Chris Stroze, ID Number: 3737 (MDPD)
       Richard Gerstein Justice Building
       1351 N.W. 12th Street
       Miami, FL. 33125

9.   Defendants, Catherine Vogel and Dawn Denaro, were and are, respectively, Assistant State Attorney's assigned to prosecute the plaintiff's criminal case at various stages during events described in this complaint that pertain to their actions. They are sued in their individual capacities.

   a.  Catherine Vogel
       1350 N.W. 12th Avenue
       Miami, FL. 33136

   b.  Dawn Denaro
       1350 N.W. 12th Avenue
       Miami, FL. 33136

5

10.   Defendant, Leopoldo Malvezzi, was the attending physician in charge of treating the alleged victim in the plaintiff's criminal case at Miami Children's Hospital during the events described in this complaint that pertain to his actions.

address:  3200 S.W. 60th Court, suite 201
Miami, FL. 33155

11.   Defendants, Pornpimol Rianthavorn, Balagangadhar Totapally, Jeffrey B. Sussmane, Syed Arshad Ali, and Dr. Dinerman, were medical doctors that treated the alleged victim in the plaintiff's criminal case at Miami Children's Hospital during the events described in this complaint that pertain to their actions. They were employed by Miami Children's Hospital during those events.

a. Dr. Pornpimol Rianthavorn
940 North East 13th Street
Oklahoma City, OK 73104
– AND –
200 Medical Plaza, suite 265
Los Angeles, CA 90095

b.  Balagangadhar Totapally, MD
Miami Children's Hospital
3100 S.W. 62nd Avenue
Miami, FL 33155 - 3009

c. Dr. Jeffrey B. Sussmane
3100 S.W. 62nd Avenue
Miami, FL. 33155

d. Dr. Syed Arshad Ali
710 Alton Rd.
Miami Beach, FL. 33139

e. Dr. MICHAEL DINERMAN
1405 Clifton Road North East
Atlanta, GA 30322

12. Defendants, Farzana Perwad and Dr. Gelvez, are medical doctors that ordered and/or performed organ pro-curement procedures on the body of the alleged victim in the plaintiff's criminal case after his death. Defendants, Perwad and Gelvez were employed by Miami Children's Hospital and/or University of Miami School of Medicine's Organ Procurement Organization during the events described in this complaint that pertain to their actions.

a. Dr. Farzana Perwad
Dept. of Pediatric Renal
400 Parnassus Avenue
San Francisco, CA 94143

b. Dr. JAVIER GELVEZ
Cook-Children's Medical Center
Fort Worth, TX 76104

13.   Defendant, Amed Roque, was the medical social worker that was involved with the alleged victim's treatment while at Miami Children's Hospital. Defendant, Roque was also active in coordinating organ harvest procedures authorization. He was employed by Miami Children's Hospital during the events described in this complaint that pertain to his actions.

address: Miami Children's Hospital
3100 S.W. 62nd Avenue
Miami, FL. 33155-3009

14.   Defendants, Jennifer L. Delphus and Michael D. Higuera, were nurses involved in the organ procurement procedures performed on the body of the alleged victim in the plaintiff's criminal case after his death at Miami Children's Hospital. Defendants, Delphus and Higuera, were employed by Miami Children's Hospital during the events described in this complaint that pertain to their actions.

a. Jennifer L. Delphus, RN
1611 N.W 12th Avenue
Miami, FL. 33136

b. Michael D. Higuera, RN
10391 S.W. 88th Street, Apt. 5
Miami, FL. 33176

15.   Defendant, Robert C. Taukus, is a registered nurse and

8

was the Hospital Coordinator for the University of Miami's School of Medicine's Organ Procurement Organization in the Daughtry Family Department of Surgery, Division of Transplantation. Defendant, Taukus, coordinated consent between the Miami-Dade County Medical Examiner's Office, the University of Miami's School of Medicine's Organ Procurement Organization and Miami Children's Hospital and he performed procurement procedures to harvest the organs of the alleged victim in the plaintiff's criminal case during the events described in this complaint that pertain to his actions.

address: 1200 N.E. 105th Street, Apt. 3
         Miami Shores, FL. 33138

16. Defendants stated in paragraphs 5 through 15 acted jointly and/or conspired with Miami-Dade County public officials, creating a nexus between them whereby the actions of all defendants stated in this complaint were under color of state law.

Facts

17. On August 6, 2000, at approximately 4:00 pm, the plaintiff,

9

Duane Walker, called 9-1-1 and requested emergency medical attention for the 2½-year-old son of his, then, girlfriend who had been injured by an in-home accident while under the plaintiff's care. The plaintiff reported that the television set in their motel room had somehow fallen from its stand onto the child.

18. The plaintiff reported that the child was non-responsive, but still with occasional spontaneous breathing. The plaintiff was not trained in CPR, but was administering CPR to the child.

19. Miami-Dade Fire Rescue subsequently arrived shortly thereafter. Emergency medical technicians arriving on the scene and treating the child reported that the child had no external bruises or injuries.

20. The child was transported via Miami-Dade Air Rescue to the defendant, Miami Children's Hospital, "... where he was listed in critical condition, but expected to survive." according to defendant, Stroze's, police report.

21. Upon arrival at Miami Children's Hospital, the child was examined by ICU doctors. At approximately 5:30 pm, Miami Children's Hospital's Trauma Service Intensive Care Unit's diagnosis was blunt chest trauma and hypoxic brain injury. At that time, the child was admitted to PICU under attending physician, defendant, Dr. Leopoldo Malvezzi. the child was not brain dead at that time.

22.   Miami Children's Hospital employee, Dr. Gim Huat Tan, told Homestead Police Department's Detective, S. Johnson, — who was initially assigned to investigate the case — that the child's brain trauma appeared to be from lack of oxygen to the brain and that Dr. Tan believed that the chest injury that the child sustained was consistent with a heavy object falling on the child restricting his breathing.

23.   Defendant, Miami Children's Hospital's medical records state that the child's injury was consistent with a heavy object falling on the child.

24.   There was no diagnosis nor treatment for blunt head trauma. Miami Children's Hospital's hospital records state that the child's brain swelling was secondary to hypoxia. There were no skull fractures, whelts, cuts, or swollen body parts aside from the brain swelling and a small, one centimeter bruise on the child's chest.

25.   The child was placed on an artificial respirator. At approximately 7:00pm on August 6, 2000 — the first day of admission at Miami Children's Hospital —, medical records state the child's blood pressure was ¹¹⁰/₇₀ and his heart rate was 90 − 100. The child had positive corneal reflex; positive gag and cough reflexes; spontaneous breathing; and showed movement in response to stimuli. However, the child was in a coma and had mild internal bleeding.

26.   Defendant, Miami Children's Hospital, never registered

the child's intracranial pressure (ICP). At 7:10pm on 8-6-00, defendant, Rianthavorn, ordered that the child be given 10 grams of mannitol one time and 5 grams of mannitol every 4 hours to lower the child's ICP, despite not having a measurement of the child's ICP.

27.    Mannitol is a strong diuretic that is sometimes used to remove water from the brain and thereby decrease ICP. Mannitol increases the osmotic pressure of glomerular filtrate, which inhibits tubular reabsorbtion of water and electrolytes and increases urinary output.

28.    The standard of care for using mannitol with pediatric patients that are suspected to have elevated ICP is to register the child's ICP prior to the administration of mannitol by using a probe or catheter inserted through the skull to the subarachnoid level and connect it to a monitor that registers the patients ICP or by cerebrospinal fluid analysis via spinal tap. Careful evaluation must be made of the circulatory and renal reserves prior to and during administration of mannitol at the higher doses and rapid infusion rates. Careful attention must be paid to fluid and electrolyte balance, body weight, and total input and output before and after infusion of mannitol. Evidence of reduced cerebrospinal fluid pressure must be observed within 15 minutes after starting infusion.

29.    Defendant, Miami Children's Hospital, never applied such standard of care in treating the child.

30.   At 8:00pm on 8-6-00, with no ICP measurement, Nikole Sanchez, RN, administered 10 grams of mannitol to the child.

31.   At 10:30pm on 8-6-00, Cathleen Destlunde, RN, was called by defendant, Miami Children's Hospital's Department of Laboratory, and notified that the child's osmolality was at a critical value; 319 mOsm/kg.

32.   Then, at 12:00am on 8-7-00, still without an ICP measurement and despite the child's osmolality being at a critical level, Sue Villanueva, RN, administered 5 more grams of mannitol to the child.

33.   At 2:00am on 8-7-00, nurse, Villanueva, was called by defendant, Miami Children's Hospital's Department of Laboratory, and notified that the child's osmolality was now at an even higher critical value: 346 mOsm/kg.

34.   At 3:10am on 8-7-00, Dr. Tan instructed nurse, Villanueva by telephone to hold the next dose of mannitol.

35.   At approximately 2:00am on 8-7-00, the child developed diabetes insipidus, becoming dehydrated, developing an electrolyte imbalance and hypotension, and began showing symptoms of hypovolemia, all adverse reactions to mannitol.

36.   Sometime shortly after Dr. Tan's order to hold the next dose of mannitol, an unknown physician ordered that mannitol,

MRI and all labs be discontinued.

31.    At that same time, hospital records indicate that the child now had no spontaneous breaths, no gag, cough, or corneal reflexes, pupils were fixed and dilated, glasgow coma scale was at 3, and that the child was considered "clinically brain dead", although not legally declared so. All meds were discontinued and the child received no medication for 12 consecutive hours between 12:00am and 12:00pm on 8-1-00, but he remained on life-support ventilator.

38.    The child was placed on "brain death protocol".

Conspiracy to Obstruct Justice

39.    While the child was on brain death protocol, defendants, Roque , Ali, Totapally, Cordero, Dinerman , Hyma, and Ignacio, conspired to commit tampering, obstruct justice and violate the plaintiff's due process right by concealing evidence of medical negligence with regard to mannitol overdose using blood transfusions and organ procurement procedures and soliciting defendant, University of Miami's School of Medicine's Organ Procurement Organization to commit tampering.

40.    At 12:00pm on 8-1-00, the child began to receive medication again, all directed at counteracting the adverse reactions to the mannitol.

-14-

41.   On 8-7-00, medical personnel at Miami Children's Hospital's PICU, informed initial investigator, Detective S. Johnson of Homestead Police Department, that the child had been pronounced brain dead.

42.   At 7:35pm on 8-7-00, Detective Johnson contacted defendant, Cordero, and informed her that she had been told by the medical personnel at Miami Children's Hospital's PICU that the child had been pronounced brain dead but was still on life support in order to harvest his organs. However, the child was not actually pronounced legally brain dead until 4:35pm on 8-8-00.

43.   At 9:00pm on 8-7-00, defendant, Cordero, contacted defendant, Ignacio, and advised her of the situation. At that time defendant, Ignacio, stated that the child was not to be harvested for organ donation until she could confer with defendant, Hyma.

44.   At that time, defendant, Cordero, contacted defendant, Roque    , by telephone and informed him that the organ donation cannot take place until defendant, Miami Children's Hospital's PICU doctors contacted Miami-Dade County Medical Examiner's Office to obtain consent for the procedure from defendant, Ignacio.

45.   At 11:00pm on 8-7-00, defendant, Totapally, contacted the plaintiff and the child's mother via telephone and requested consent from the child's mother to perform a blood transfusion

on the child. Defendant, Totapally, knew that the child was considered clinically brain dead pending apnea test and knew that a blood transfusion could not improve the child's condition, but deceitfully led the child's mother and the plaintiff to believe that the procedure was necessary to save the child's life.

46.   At the time, the child's mother nor the plaintiff was aware that the child was likely already brain dead. Defendant, Totapally, did not inform the child's mother of this information.

47.   At the time that consent for the blood transfusion was given, consent for the child's organs to be donated had not yet been requested nor given by the child's mother or by the Miami-Dade County Medical Examiner's Office.

48.   The first blood transfusion was performed at 11:05pm on 8-7-00 until 2:05am on 8-8-00. This transfusion was for A-negative red blood cells. The child's blood type was A-negative.

49.   The next blood transfusion was for AB-negative, fresh frozen plasma and was administered from 2:00am to 4:00am on 8-8-00.

50.   At 9:00am on 8-8-00, defendant, Cordero, spoke with defendants, Ignacio and Hyma. Defendant, Hyma, approved the organ harvest, stating that, should there be additional in-

ternal trauma, the harvest team would immediately stop and contact the Medical Examiner's office.

51.   At that time, defendant, Cordero, made contact with defendant, Ali, who was also informed of the above information. Defendant, Ali, stated that the harvest team and the child were in preparation and that the operation would not begin until later in the evening of 8-8-00 or in the early morning of 8-9-00.

52.   Defendant, Stroze, was aware that steps were being taken to harvest the organs or otherwise distrub the corpus delicti during a homicide investigation, but did not intervene in order to protect the plaintiff's right to the due process of law, by preventing the organ procurement procedures.

53.   Defendants, Totapally and Roque  , spoke to defendant, Ignacio, informing her of the child's severe reaction to the mannitol and critical osmolality level. Defendant, Ignacio, still consented to the organ harvest.

54.   Defendants, Ali, Roque , Dinerman  , Totapally, Sussman and Taukus arranged the procurement procedures between defendants, Miami Children's Hospital and the University of Miami's School of Medicine's Organ Procurement Organization.

55.   At 10:00 am on 8-8-00, the child was still considered to be clinically brain dead and awaiting neurologist consultation.

56. The final blood transfusion was with AB-negative fresh frozen plasma, and was performed at 11:06 am on 8-8-00 until 12:00 pm.

57. At approximately 12:30 pm on 8-8-00, the plaintiff and the child's mother were told that the child was pronounced brain dead. At that time, the child's mother signed an acknowledgement of brain death and consent forms for organ donation. The child's mother and the plaintiff then said their final goodbyes to the child and left the hospital.

58. Criteria for brain death was met at 4:35 pm on 8-8-00 and the child was officially declared legally brain dead by Neurologist, Dr. Oscar Papazian, and defendant, Totapally. However, the child was not removed from life support at that time and the body of the deceased continued to receive fluids and other medications.

## Tampering

59. At or around 9:00 am on 8-8-00, the child was evaluated by hospital personnel and considered to a medically suitable organ donor.

60. Defendant, University of Miami's School of Medicine's Organ Procurement Organization, became involved with the child's case on 8-7-00 at or around 1:00 pm. Defendant, Taukus, expressed

to the Miami-Dade County Medical Examiner's Office interest in harvesting the child's organs, including the child's liver, despite lacerations.

61.  After the child was pronounced legally brain dead, defendants, Gelvez, Delphus, Taukus, Ali, Perwad, Sussmane and Higuera, continued to perform many procedures on the body of the deceased for approximately 10 hours before the body was removed from life support. These procedures included taking lab specimens, a lymph node dissection, administering fluids and other medications, and laboratory analyses among other things.

62.  Defendant, Rianthavorn — the same doctor responsible for negligently administering the mannitol to the child — and defendant, Malvezzi, fabricated a misleading death summary with omissions and false information regarding mannitol and the child's hospital course.

63.  No organs were ever harvested from the deceased, injured nor uninjured. Neither was there any other surgical procedure performed on the body of the deceased aside from the lymph node dissection. Around 2:40am on 8-9-00, the deceased was declared ineligible as an organ donor following the results of a laboratory specimen analysis, the contents of which were never disclosed to the plaintiff.

64.  The child's body was removed from life support at that time.

65.   No clear or consistent explanation was given as to why the deceased was declared ineligible as a donor.

## Failure to Preserve Critical and Exculpatory Evidence

66.   The body of the deceased was finally transported to the Miami-Dade County Medical Examiner's Office arriving at 4:35 am on 8-9-00, 12 hours after time of death. No records of the procurement procedures or laboratory analyses therefrom were ever forwarded to the medical examiner's office.

67.   Defendant, Lew, performed an autopsy examination at or around 9:30 am. By not testing, or ordering to have tested, any fluids taken directly from the body of the deceased, defendant, Lew, failed to perform a complete autopsy on the body. Defendant, Lew, ruled the cause of death to be blunt trauma injuries. The manner of death was ruled homicide, stating that the injury occurred from being beaten by other person(s).

68.   Defendant, Lew, omitted from her report information about the postmortem procurement procedures.

69.   Defendant, Lew, did not test or order a toxicology analysis on a specimen of the deceased's postmortem blood or urine taken directly from the deceased body. Instead, defendant, Lew, specifically requested from defendant, Miami Children's Hospital, a specimen of the deceased's "admission" blood or

urine.

70.   On 8-10-00, defendant, Lew, received from Miami Children's Hospital a specimen of the child's blood taken from him upon admission into the hospital on 8-6-00.

71.   On 8-13-00, custody of the deceased's body was transfered to Barrett-Fryar Thompkins funeral home and the body was subsequently cremated.

72.   An analysis of the deceased's postmortem blood or urine would have revealed serum or urine osmolality exposing mannitol overdose and related medical negligence as the cause of death. This evidence was exculpatory, critical and material to the cause of death. It was direct evidence, yet it was never preserved by any of the defendants.

## Prosecutorial Misconduct

73.   On 8-9-00, the plaintiff was arrested by Miami-Dade Police Department and charged with aggravated child abuse and second degree murder. Felony information was filed on 8-30-00 by defendant, Vogel, and at that time, plaintiff's counsel demanded discovery.

74.   The plaintiff was on probation at that time for an unrelated case.

75.   The plaintiff and his defense counsel knew nothing of the postmortem procurement procedures.

76.   Felony information was subsequently dismissed and an indictment was filed on 9-13-00 charging the plaintiff with first-degree premeditated murder and aggravated child abuse. The State of Florida is seeking the death penalty in that case.

77.   The plaintiff's defense in the criminal case is that the initial injury to the child was caused by the television set falling on him, but that subsequent medical negligence caused the child's death.

78.   On 9-14-00, defendant, Vogel, provided the plaintiff with an amended discovery exhibit containing the hospital records from Miami Children's Hospital pertaining to the case. Omitted from the medical records were any records of and pertaining to any procedures performed on, and/or in relation to, the body of the deceased between 4:35pm on 8-8-00 (time of death) and 2:30am on 8-9-00 (the time that the deceased was removed from life support).

79.   A probation violation hearing proceeded in 2003 where defendant, Denaro, presented evidence from defendant, Lew's, autopsy examination as well as defendant, Lew's testimony. At the time, the plaintiff and his counsel still had not been provided with information regarding the organ procurement procedures performed in relation

-22-

to, or on, the body of the deceased after he was pronounced legally brain dead. The plaintiff and his counsel were unaware of the existence of those events.

80.  The plaintiff was found guilty of violating probation by committing murder based upon the testimony of defendant, Lew, and was sentenced to 30 years with 10 years minimum mandatory by the 11th Judicial Circuit Court.

81.  The plaintiff has since filed a motion to correct an illegal sentence on 3-21-08 contesting the sentence imposed in that case. The motion is currently pending a ruling.

82.  On 9-10-03, defendant, Denaro, filed a superceding indictment changing the charge from first degree premeditated murder to first degree felony-murder.

83.  All charging documents filed against the plaintiff for the homicide made use of a 60-63 day time frame for the commission of the murder, and the child abuse.

84.  In December of 2007, the plaintiff, while pro se at the time, filed a motion for a statement of particulars requesting the time and date of death of the corpus delicti, the date and place of the alleged commission of the felony-murder, and the date and place of the commission of the alleged aggravated child abuse.

85.   The motion for statement of particulars was granted by the court with regard to the time and date of death and the date and place of the alleged commission of the felony-murder, but was denied with respect to the date and place of the alleged aggravated child abuse.

86.   On 12-26-07, defendant, Denaro, instead provided the plaintiff with a statement of particulars stating that the child was beaten on 8-6-00 and "was taken off life support on or about August 9, 2000." Defendant, Denaro's, statement of particulars was misleading with respect to the time and date of death.

87.   On 1-30-08, defendant, Denaro, filed a third and superceding indictment in the case. Up until that time, the plaintiff had never been arraigned on the allegations against him.

88.   In February of 2008, the plaintiff, still pro se at the time, went on record in open court that the statement of particulars provided to the plaintiff, Mr. Walker, by the defendant, Denaro, was misleading to the plaintiff's defense preparation with respect to time and date of death.

89.   The plaintiff stated on record that there was an omission or gap in the hospital records provided

by defendant, Vogel, to the plaintiff. The plaintiff stated that from the time the child was pronounced legally brain dead, 4:35pm on 8-8-00, to the time that the child was removed from life support at 2:30am on 8-9-00, there were no records of what happened to the body for those 9 hours and 55 minutes.

90.   On 2-19-08, approximately 7½ years after notice of discovery agreement, defendant, Denaro, finally provided the plaintiff with an amended discovery exhibit that contained a 4-page "progress notes" from defendant, Miami Children's Hospital, that is an <u>outline</u> of events from the time that the child was received from the emergency room at 4:25pm on 8-6-00 to 2:55am on 8-9-00.

91.   Those hospital progress notes provided to the plaintiff by defendant, Denaro, on 2-19-08 are not a detailed account of the procurement course of events consistent with the style and volume of the other hospital records for the same amount of time. They lack lab results, reports or statements of physical examinations, physicians' orders, and medication or fluid administration data.

92.   The amended discovery's progress notes only establishes that certain procedures were performed on the body after the time of death, that lab specimens were taken, that defendants named in this complaint

Were involved in those postmortem procedures, and that lab results were obtained.

93.  The amended discovery does not disclose what any of those results or findings were.

94.  In or around May of 2008, the plaintiff execised his right to counsel in the criminal case. The plaintiff requested that his counsel obtain records of those postmortem procedures, including: postmortem blood and urine specimens to test, lab results, liver function analysis findings, and findings from the lymph node dissection analysis. The plaintiff's request was made based upon the data contained in the State's amend- ed discovery provided to the plaintiff on 2-19-08.

95.  The plaintiff's investigator attempted to obtain the above evidence from defendants, Miami Children's Hospital and the University of Miami's School of Medicine, and was informed that they no longer existed.

96.  On 3-12-09, the plaintiff's defense counsel then req- uested said evidence from defendant, Denaro, by discovery.

97.  On 3-13-09, defendant, Denaro, provided the plaintiff with an amended discovery exhibit stating "I have requested all of the victim's medical records from the hospital. Every- thing the hospital has given to me has been turned over to

you. Everything that I have from the medical examiner's office has been turned over to your office."

## Denial of Due Process

98.    After the administration of the first dose of mannitol at 8:00 pm on 8-6-00, hospital lab chart shows that the child's serum and urine osmolality consistently remained at critical levels through to 12:30 pm on 8-8-00, according to the last value recorded that was disclosed to the plaintiff. This — and the fact that all of the treatment that the child received after the administration of the mannitol was to counteract adverse reactions to the drug — indicates that any postmortem blood or urine specimen analysis taken shortly after the time of death was exculpatory and would have been useful to the plaintiff to convince a jury that subsequent medical treatment caused the child's death.

99.    In the event that the plaintiff is or was convicted in the criminal case, the evidence that was lost and destroyed would have been favorable to prevent the plaintiff from receiving the death penalty.

100.    At no time has the plaintiff ever had access to this critical evidence for inspection, nor has he been able to have his expert render an opinion on the merits thereof for his criminal defense.

101.    The plaintiff has been unable to obtain evidence comparable to the lost and destroyed critical exculpatory evidence, that being the postmortem fluids analyses and/or specimens, or postmortem tissue toxicology or specimens.

102.    The harm from the actions and omission of the defendants to this complaint accrued on 3-13-09 when, after the plaintiff's specific request for said evidence, defendant, Denaro, finally expressed to the plaintiff and his defense counsel that said exculpatory critical evidence had not been preserved and is otherwise unavailable.

103.    In 2003, the plaintiff was found guilty of violating probation by committing murder in a hearing where defendant, Denaro, unconstitutionally withheld from the plaintiff and state court exculpatory evidence and the knowledge of those postmortem events.

104.    With the loss and destruction of said evidence, the plaintiff has no alternative means of demonstrating that mannitol toxicity cause the child's death.

105.    The plaintiff has been suffering from severe depression with great fright and despair over the past 8 years and 8 months awaiting trial facing the death penalty by lethal injection for a crime that he did not commit.

106.    The plaintiff has been awaiting trial with the belief

-28-

that he will be unable to expose the truth and thereby exonerate himself because of the actions of the defendants to this complaint.

107. The plaintiff has had to, reluctantly, discontinue communications with his two young children and teenage stepson in order to protect them from the severe emotional strain of his criminal trial and likely sentence to death with the loss and destruction of the incomparable exculpatory evidence.

108. The plaintiff has attempted suicide by overdose of medication two times while awaiting trial in great fright and despair, whereas on one occasion he had to be hospitalized and was in a coma for 3 days in Ward D at Jackson Memorial Hospital.

109. The plaintiff has had other thoughts of suicide out of a great sense of despair to prove his innocence and had to voluntarily seek staff psychiatric help where he was placed in a suicide prevention cell on two separate occasions.

110. Within the past year, the plaintiff has tested positive for PPD from continuous exposure to tuberculosis while awaiting trial in jail. Prior to his incarceration, and up to 1½ years ago, the plaintiff was negative for PPD. Now, the plaintiff will forever be at risk of the PPD bacteria developing into tuberculosis.

# Causes of Action

111.   The actions of defendants, Hyma, Ignacio, Cordero, Totapally, Ali, Dinerman, and Roque, stated in paragraphs 39, 41, 43-46, 50, 51, 53, 54 and 58 of this complaint, in coordinating, approving and arranging to procure the alleged victim's organs during a murder investigation after death but before the autopsy, were under color of state law and in furtherance of an agreement to commit acts that altered the corpus delicti and destroyed critical evidence of medical negligence prior to the autopsy, thereby depriving the plaintiff of equal protection of the laws and due process of the law. Those actions constituted civil conspiracy and deliberate indifference and were in violation of the Fourteenth Amendment to the United States Constitution.

112.   The actions of defendants, Hyma and Ignacio, stated in paragraphs 39, 43, 44, 50, and 53 constituted negligence for the following reasons:

       a. Defendants, Hyma and Ignacio had a duty to instruct defendant, Miami Children's Hospital, that upon declaration of brain death of the alleged victim, the body of the deceased should not be disturbed until examined by the medical examiner, pursuant to Rules 11G-2.001(5)(a) and 11G-2.004(4)(b) of the Florida Administrative Code.

b. Defendants, Hyma and Ignacio breached that duty by granting permission to defendants, Miami Children's Hospital and University of Miami's School of Medicine's Organ Procurement Organization, to procure the organs of the alleged victim during a homicide investigation.

c. The breach of that duty proximately caused the alteration, loss and destruction of exculpatory and critical evidence (viz. postmortem fluids and tissue specimens).

d. The breach of that duty resulted in the above exculpatory and critical evidence being unavailable to the plaintiff to prepare his criminal defense for trial. That breach of duty also caused the plaintiff to be found guilty of the substantial violation of probation: committing a homicide, without the opportunity to make use of said evidence, at the probation violation hearing.

113.    The actions of defendants, Hyma and Ignacio stated in paragraphs 39, 43, 44, 50 and 53, in advising in the procurement of the alleged victim's organs by defendants, Miami Children's Hospital and University of Miami's School of Medicine's Organ Procurement Organization, during the homicide

investigation where the death was suspected to be by criminal violence constituted the tort of criminal solicitation to obstruct justice falsely under color of law under Florida Statutes 772.102 (1)(a)(29) and 843.0855 (4).

114.  The actions of defendants, Hyma and Ignacio, stated in paragraphs 39, 43, 44, 50 and 53, in approving the organ harvest, constituted the tort of conspiracy to commit tampering by altering under Florida Statutes 772.102 (1)(a)(34) and 918.13 (1)(a).

115. The actions of defendant, Cordero, stated in paragraphs 39, 43, 44, 50 and 51 of this complaint, in advising and coordinating defendants, Ignacio, Roque, and Ali, to authorize the organ procurement during a homicide investigation constituted the tort of criminal solicitation to obstruct justice falsely under color of law under Florida Statutes 772.102 (1)(a)(29) and 843.0855 (4).

116. The actions of defendant, Cordero, stated in paragraphs 39, 43, 44, 50 and 51 of this complaint, in advising and coordinating defendants, Ignacio, Roque, and Ali, to authorize the organ procurement during a homicide investigation constituted the tort of criminal conspiracy to commit tampering under Florida Statutes 772.102 (1)(a)(34) and 918.13 (1)(a).

117.   Defendants, Cordero and Stroze's failure to act to prevent the organ harvest constituted negligence for the following reasons:

a. Defendants, Cordero and Stroze are public officers sworn under Article II, Section 5 of the Florida Constitution as law enforcement officers with a duty to protect and defend the Florida Constitution. The plaintiff, as a resident citizen of the state of Florida, enjoys the right to the equal protection of the laws and the right to the due process of law, whereby defendants, Cordero and Stroze, had a duty to protect those rights.

b. Defendants, Cordero and Stroze, breached that duty by failing to intervene to prevent the organ procurement process.

c. The breach of that duty proximately caused the altering, loss and destruction of exculpatory and critical evidence.

d. The breach of that duty resulted in said evidence being unavailable for the plaintiff to obtain an expert opinion on the merits of this critical evidence, depriving the plaintiff of the due process of law in violation of the Fourteenth Amendment to the U.S. Constitution. The plaintiff's

ability to refute defendant, Lew's, opinion upon cross-examination is severely hindered.

118.    The actions of defendants, Totapally, Ali, Dinerman and Roque stated in paragraphs 39, 41, 45, 46, 53, 54 and 58, in organizing the procurement of the alleged victim's organs, misleading the child's mother in order to obtain consent for a blood transfusion that could not possibly save the child's life, knowing the he was already clinically brain dead, providing false information regarding pronunciation of brain death to Homestead Police Department's Detective, Sheila Johnson, and while aware that a homicide investigation was in progress constituted the tort of criminal conspiracy to obstruct justice under Florida Statutes 772.102(1)(a)(29) and 843.02.

119.    The actions of defendants, Totapally, Ali, Dinerman, and Roque stated in paragraphs 39, 41, 45, 46, 53, 54 and 58, in organizing the procurement of the alleged victim's organs and urging defendant, University of Miami's School of Medicine's Organ Procurement Organization, to harvest the alleged victim's organs during a homicide investigation constituted the tort of criminal solicitation to commit tampering under Florida Statutes 772.102(1)(a)(34) and 918.13(1)(a).

120.    The actions of defendants, Ali, Sussmane, Perwad, Taukus, Delphus, Higuera and Gelvez, stated in paragr-

aphs 60 and 61 of this complaint, in performing organ pro-curement procedures on the body of the deceased after he was pronounced legally brain dead during a homi-cide investigation, constituted the tort of obstruction of justice under Florida Statutes 772.102(1)(a)(29) and 843.02.

121.   The actions of defendants, Ali, Sussmane, Perwad, Taukus, Delphus, Higuera and Gelvez, stated in paragraphs 60 and 61 of this complaint, in performing organ procurement procedures on the body of the deceased after he was pro-nounced legally brain dead during a homicide investig-ation, constituted the tort of criminal tampering under Florida Statutes 772.102(1)(a)(34) and 918.13(1)(a).

122.   The actions of defendants, Rianthavorn and Malv-ezzi, stated in paragraphs 26, 29 and 62, in omitting and falsifying information in the death summary that was mat-erial to the homicide investigation and exculpatory to the plaintiff's defense, were overt and in furtherance of civil conspiracy and constituted the torts of criminal tam-pering under Florida Statutes 772.102(1)(a)(34) and 918.13 (1)(a), and conspiracy to obstruct justice under Florida Statutes 772.102(1)(a)(29) and 843.02.

123.   The actions of defendant, Lew, stated in paragraphs 67 through 70 constituted gross negligence for the foll-owing reasons:

a. Defendant, Lew, had a duty to perform a complete autopsy examination on the body of the deceased, including testing fluids taken directly from the body of the deceased pursuant to Rule 11G-2.003(1)(d) and (3)(a).

b. Defendant, Lew, breached that duty by willfully refusing to test blood, urine or any other fluid specimen taken directly from the corpus delicti and instead, in bad faith to circumvent the detection of mannitol toxicity or other medical negligence, requesting from defendant, Miami Children's Hospital, antemortem or "admission blood." Then, only testing the admission blood specimen that was taken from the alleged victim 3 days prior to death.

c. The breach of that duty caused the fluids of the corpse to be destroyed upon the cremation of the deceased's body without ever being analyzed by a medical examiner or under the order of the medical examiner.

d. The breach of that duty resulted in said

critical and exculpatory evidence being forever lost and unavailable to the plaintiff to obtain an expert opinion on the merits of that critical evidence. depriving the plaintiff of the due process of law in violation of the Fourteenth Amendment to the U.S. Constitution. The plaintiff's ability to refute the opinion of defendant, Lew, on cross-examination is severely hindered.

124.   The actions of defendant, Lew, stated in paragraphs 67 through 70 in this complaint, in only testing the admission blood, demonstrate her bad-faith intention to circumvent exposing and preserving the evidence of mannitol poisoning that existed in the blood and urine fluids of the corpus delicti. Her actions were in furtherance of civil conspiracy to deprive the plaintiff of equal protection of the law and constituted deliberate indifference to the plaintiff's right to the due process of law in violation of the Fourteenth Amendment to the U.S. Constitution.

125.  The actions of defendant, Lew, stated in paragraphs 67 through 70 of this complaint, in willfully refusing to test or have tested blood, urine or any other fluid or tissue specimen taken directly from the corpus delicti and instead requesting "admission blood" to be tested constituted the tort of criminal tampering by concealment under Flor-

-37-

ida Statutes 772.102(1)(a)(34) and 918.13(1).

126.   The actions of defendant, Lew, stated in paragraphs 69 through 70 of this complaint, in omitting any postmortem toxicology analysis of fluids and including antemortem toxicology analysis of fluids in her official autopsy report constituted the tort of criminal obstruction of justice by simulating a legal document under Florida Statutes 772.102(1)(a)(29) and 843.0855(3).

127.   The actions of defendants, Vogel and Denaro, stated in paragraphs 73, 78, 79, 86, 88, 90, 91 and 97 of this complaint, constituted negligence in their duty to disclose for the following reasons:

    a.  Defendants, Vogel and Denaro, had a duty to disclose the hospital records, lab results, examination data, and all other tests and information generated from the organ procurement procedures performed on the body of the deceased after death within 15 days after Notice of Discovery pursuant to FL. R. Crim. P. 3.220(b)(1)(B) and (J).

    b.  Defendants, Vogel and Denaro, breached that duty by failing to disclose any information regarding the above until 2-19-08, approximately 7½ years after

notice of discovery. The amended discovery exhibit provided to the plaintiff on 2-19-08 still omits all essential information regarding those events and scientific tests.

c. The breach of that duty caused the plaintiff and his defense counsels to be unaware of critical and material information for 7½ years regarding the postmortem procurement procedures performed on the body of the deceased after death, lab specimens that were tested, and that witnesses to those events were available for deposition.

d. the breach of that duty resulted in the unnecessary 8-year and 8 months delay in trial defense preparation and trial commencement, and in the plaintiff being found guilty of violating probation by committing murder and sentenced to 30 years with 10 years minimum mandatory without the opportunity to use critical and exculpatory evidence at the probation violation hearing. This deprived the plaintiff of the due process of law in violation of the Fourteenth Amendment to the U.S. Constitution.

128.  The actions of defendants, Rianthavorn, Malvezzi, Ali, Roque, Taukus, Totapally, Dinerman, Perwad, Gelvez, Delphus, Higuera, and Sussmane, stated in paragraphs 26, 29, 39, 41, 45, 46, 53, 54, 58 and 60 through 62 of this complaint, constituted joint negligence on the part of defendants, Miami Children's Hospital and University of Miami's School of Medicine's Organ Procurement Organization for the following reasons:

a.  Defendants, Miami Children's Hospital and University of Miami's School of Medicine's Organ Procurement Organization, had a legal duty, in a homicide investigation, to not physically alter the body of the deceased after death and to not obstruct justice by providing law enforcement officials with incomplete or false information material to the death.

b.  Defendants, Miami Children's Hospital and University of Miami's School of Medicine's Organ Procurement Organization, breached that duty by performing organ procurement procedures on the body of the deceased for approximately 10 hours after he was pronounced legally brain dead, by failing to disclose complete and accurate records of those unlawful events and all scientific tests therefrom, and by fabricating the death summary.

c.  The breach of that duty proximately caused critical, exculpatory and material evidence within, and that of, the postmortem fluids and tissue specimens and

– 40 –

the analyses therefrom, to be altered, lost and destroyed.

d. The breach of that duty resulted in said evidence being unavailable to the plaintiff to demonstrate his innocence of the murder at the probation violation hearing, where he was sentenced to 30 years in prison with 10 years minimum mandatory, to demonstrate his innocense of the murder at trial, to prepare his criminal defense, and to prevent the punishment of death by lethal injection, if convicted at trial. The breach of that duty violated the Fourteenth Amendment to the U.S. Constitution by depriving the plaintiff of the due process of law.

129. The actions of defendants, Hyma, Ignacio, Lew, Cordero and Stroze, stated in paragraphs 39, 43, 44, 50−53, and 67 through 70 of this complaint, constituted gross negligence on the part of defendant, Miami−Dade County, in its duty to preserve evidence that is critical, exculpatory and material to the cause of death in a homicide investigation for the following reasons:

a. Defendant, Miami−Dade County, as a local government of the state of Florida, had an active duty, once notified of a death in a murder investigation, to preserve the body of the deceased until examined by the medical examiner, perform a

complete autopsy on the body, including the testing of specimens taken directly from the corpus delicti, and to retain those specimens for one year, pursuant to Florida Administrative Code, Rules 11G-2.001, 2.003 and 2.004.

b.  Miami-Dade County Medical Examiner's Office had jurisdiction over the body of the deceased upon death. Defendant, Miami-Dade County, breached its duty when approval by medical examiner, defendant, Hyma, for the procurement of the deceased's organs was sought out by other Miami-Dade County public officials, defendants Stroze, Cordero, and Ignacio. Defendant, Hyma's, official character is such as to lend the weight of Miami-Dade County to his decisions. Defendant, Hyma, then made an official decision to allow defendants, Miami Children's Hospital and University of Miami's School of Medicine's Organ Procurement Organization to alter the corpus delicti after death, but prior to an examination by the medical examiner.

Defendant, Lew's, actions stated in paragraphs 60 through 67, in willfully failing to test or have tested blood, urine or any other fluid or tissue specimen taken directly from

the corpus delicti, while instead requesting and testing "admission", antemortem blood and allowing the body of the deceased to be cremated without retaining specimens from it, further breached that duty to preserve.

c. The breach of that duty proximately caused the alteration, loss and destruction of critical, exculpatory and material evidence of the cause of death.

d. The breach of that duty resulted in said evidence being unavailable to the plaintiff to demonstrate his innocence of the murder at the probation violation hearing, where he was sentenced to 30 years in prison with 10 years minimum mandatory; to demonstrate his innocense of the murder at trial; to prepare his criminal defense; and to prevent the punishment of death by lethal injection, if convicted at trial. The plaintiff is also severely hindered in refuting the opinion of defendant, Lew, upon cross-examination. This breach of duty violated the Fourteenth Amendment to the U.S. Constitution by depriving the plaintiff of the due process of law.

## Relief Requested

WHEREFORE, plaintiff, Duane Isaac Walker, requests that the court grant the following relief:

A. Issue a declaratory judgment stating that:

1. Defendants, Hyma, Ignacio, Cordero, Totapally, Ali, Dinerman and Roque, in coordinating, approving, advising and arranging the procurement of the alleged victims organs during a homicide investigation, their actions were under color of law and in furtherance of an agreement to commit acts that altered the corpus delicti prior to an autopsy, depriving the plaintiff of equal protection of the laws and of the due process of the law in violation of the Fourteenth Amendment to the U.S. Constitution, that those actions constituted deliberate indifference to the plaintiff's fundamental rights as well as conspiracy to obstruct justice and commit tampering under Florida law.

2. Defendants, Miami-Dade County, Hyma, Ignacio, Lew, Stroze and Cordero's, actions in failing to preserve critical, exculpatory and material evidence constituted gross negligence and violated the plaintiff's rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution.

3.   Defendant, Hyma's and Defendant, Ignacio's actions, in approving and advising in the procurement of the alleged victim's organs during a murder investigation, constituted obstruction of justice under Florida law.

4.   Defendant, Cordero's actions, in advising and coordinating defendants, Ignacio, Roque, and Ali, to authorize the organ harvest during a homicide investigation, constituted obstruction of justice under Florida law.

5.   The actions of defendants, Ali, Sussmane, Perwad, Taukus, Delphus, Higuera, and Gelvez, in performing organ procurement procedures on the body of the deceased after he was pronounced dead during a murder investigation, were under color of law and in furtherance of an agreement to commit acts that would alter the corpus delicti prior to an autopsy, deprived the plaintiff of equal protection of the laws and of the due process of the law in violation of the Fourteenth Amendment to the U.S. Constitution, and that those actions constituted obstruction of justice and tampering under Florida law.

6.   Defendant, Lew's actions, in willfully refusing to test or have tested blood, urine or any other fluid or tissue specimen taken directly from the corpus delicti

and instead requesting and testing antemortem blood taken from the alleged victim two days prior to death, failed to preserve critical, exculpatory and material evidence and deprived the plaintiff of the due process of law in violation of the Fourteenth Amendment to the U.S. Constitution and constituted obstruction of justice and tampering by concealment under Florida law.

7.  Defendant, Rianthavorn's and defendant, Malvezzi's actions, in omitting and falsifying information in the death summary that was material to the homicide investigation and exculpatory to the plaintiff's defense, were overt and in furtherance of civil conspiracy and constituted obstruction of justice and tampering under Florida law.

8.  Defendant, Vogel and defendant, Denaro's actions in failing to disclose to the plaintiff any information regarding the procurement procedures performed on the body of the deceased after death and before autopsy until 7½ years later, deprived the plaintiff of the due process of law in violation of the Fourteenth Amendment to the U.S. Constitution, constituted gross negligence and prosecutorial misconduct.

9.  The actions of defendants, Rianthavorn, Malvezzi, Ali, Roque, Taukus, Totapally, Dinerman, Perwad, Gelvez,

Delphus, Higuera, and Sussmane, stated in paragraphs 26, 29, 39, 41, 45, 46, 53, 54, 58 and 60 through 62 of this complaint, constituted joint negligence on the part of defendants, Miami Children's Hospital and the University of Miami's School of Medicine's Organ Procurement Organization depriving the plaintiff of equal protection of the laws and the due process of law in violation of the Fourteenth Amendment to the U.S. Constitution.

B.  Award compensatory damages jointly and severally against:

1.  Defendants, Miami-Dade County, Miami Children's Hospital, University of Miami's School of Medicine's Organ Procurement Organization, Hyma, Ignacio, Lew, Stroze, Cordero, Rianthavorn, Ali, Malvezzi, Roque, Taukus, Totapally, Dinerman, Gelvez, Perwad, Sussmane, Delphus, and Higuera for the emotional injury resulting from their deliberate indifference to the plaintiff's right to due process of law.

2.  Defendants, Vogel and Denaro, for the emotional injury sustained as a result of their failure to disclose critical and material information of the postmortem procurement procedures prior to the probation hearing which deprived the plaintiff of a fair hearing.

C.  Award punitive damages against defendants, Miami Children's Hospital, University of Miami's School of Medicine's Organ Procurement Organization, Hyma, Stroze, Ignacio, Lew, Cordero, Vogel, Denaro, Rianthavorn, Malvezzi, Roque, Ali, Totapally, Dinerman, Taukus, Gelvez, Perwad, Sussmane, Delphus, and Higuera.

D.  Grant such other relief as it may appear that plaintiff is entitled.

date: __5-1-09__

NOTARY PUBLIC
Metro-West
James Garcia  e.c.I
5-1-09

JAMES GARCIA
MY COMMISSION # DD774680
EXPIRES: April 01, 2012
FL Notary Discount Assoc. Co.

Respectfully submitted,

Duane Walker
Duane Isaac Walker, plaintiff, pro se
Metro West Detention Center
13850 N.W. 41st Street, SMU-South-150
Miami, FL. 33178